UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LARRY CRAIG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 1:23-cv-02075-JRS-MKK |
| | ) |
| D. REAGLE Warden, et al., | ) |
| | ) |
| Defendants. | ) |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiff Larry Craig filed this civil action, alleging that he was denied recreation while housed at Pendleton Correctional Facility. Defendants have moved for summary judgment. Dkt. [50]. For the reasons below, that motion is **GRANTED**.

**I.
Standard of Review**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Craig and draws all reasonable inferences his favor. *Khungar*, 985 F.3d at 572–73.

### A. The Parties

At all relevant times, Mr. Craig was an Indiana Department of Correction ("IDOC") inmate housed at Pendleton Correctional Facility ("Pendleton").

Defendants were all staff working at Pendleton. Warden Reagle was the Warden at Pendleton. Dkt. 51-1. Major Mike Conyers was a Correctional Major. Dkt. 51-2. Captain Jim Boldman and Captain Jason Ernest were Correctional Captains. Dkt. 51-3; dkt. 51-4. Lieutenant Jonathan Jackson was a Correctional Lieutenant. Dkt. 51-5.

### B. COVID-19 at Pendleton

From the outset of the COVID-19 pandemic in 2020, Pendleton had to change some of its policies and procedures to comply with directives and guidelines from IDOC Central Office and outside medical experts concerning the containment and prevention of spreading COVID-19 in a

prison setting. Dkt. 1-1 at 1. These guidelines from IDOC Central Office would change and fluctuate frequently as more was learned about addressing the pandemic. *Id*. at 2. These guidelines included the length of quarantine and isolation period, and separation within the facility. *Id*.

Additionally, each staff member reporting to work would have their temperature taken and complete a brief questionnaire prior to entering the facility. *Id*. If their temperature was too high, or they were sick or exposed to COVID-19, the staff member was not allowed entrance to the facility to prevent the transmission of COVID-19 from outside sources. *Id*. This had an impact on staffing levels. *Id*.

If an inmate in a housing unit tested positive for COVID-19, Pendleton staff would quarantine the other offenders in the same housing unit in an attempt to contain the virus spreading in the prison. *Id*. at 2-3. Each inmate in the housing unit would get evaluated. Dkt. 51-6 at 24-26. During quarantine, all meals would be brought to the inmate's cell for them to consume them within their cell. Dkt. 51-6 at 26-27.

To run outdoor recreation time, eight staff members were required at the beginning of the pandemic, but that evolved to a minimum of six staff members. Dkt. 51-1 at 3. Due to the impact of COVID-19, occasionally there was insufficient staffing to conduct a full outdoor recreation session every day of the week. *Id*. at 4. Outdoor recreation also does not occur if the outdoor or wind chill temperatures are below twenty degrees Fahrenheit. *Id*.

### C.  Mr. Craig's Recreation

In November 2021, Mr. Craig was housed in the J Cell House ("JCH") at Pendleton. Dkt. 51-6 at 9-14. Mr. Craig did not have a cellmate. *Id*. at 9. Mr. Craig alleges that he did not receive any recreation time for all of November and December 2021. *Id*. at 9-14. JCH was on quarantine

status for at least a portion of that time. Dkt. 51-6 at 24-25. The recreation limitations were not uniquely applied to Mr. Craig; they were implemented across the entire unit. *Id*. at 22.

Mr. Craig alleges he spoke with and wrote letters to Major Conyers, Captain Boldman, and Warden Reagle during this time about the lack of recreation. Dkt. 51-6 at 12-18. Mr. Craig testified that they did not provide a definitive answer as to why recreation was not occurring, but that the reasons would vary between safety and security concerns, staffing considerations, and COVID-19 quarantine restraints. Dkt. 1 at 3-4; dkt. 51-6 at 15-17, 23-24. Mr. Craig testified that they directed him to file a grievance about his concerns. Dkt. 51-6 at 16-17.

In January 2022, Mr. Craig started getting recreation time again. Dkt. 51-6 at 29-31. Between January 2022 and July 2023, he testified that recreation would occur at least on a weekly basis. *Id*.

On February 2, 2022, Mr. Craig filed a grievance regarding access to recreation time while on quarantine. Dkt. 51-7. He alleged that "staff are making [the staff shortage] a shortage because they have to pull the regular officers out there (sic) assign[ed] housing units to shake down offenders." *Id*. He further alleged that staff were conducting "false safety and security shakedowns and quarantines." *Id*.

Mr. Craig was moved from JCH to GCH on July 21, 2023, where he stayed until March 2024. Dkt. 51-6 at 31-32. He testified that he would "sometimes" receive recreation on a weekly basis on Wednesdays in GCH, but sometimes it would not occur. *Id*. at 32. Mr. Craig was told that recreation would occur when staffing levels were sufficient. *Id*. at 33-34. Mr. Craig testified that insufficient staffing "was not a reason to run recreation" because "the counselors is here every single day." *Id*. at 34.

While unit team staff such as caseworkers (commonly referred to as counselors), do occasionally assist in running outdoor recreation, this is not a responsibility of theirs and this is only possible when their various existing job duties and responsibilities allow them the time to assist. Dkt. 51-2. These unit team staff members are not custody staff. *Id*.

Mr. Craig had no interaction with Captain Ernest or Lt. Jackson before he was moved to GCH in July 2023. Dkt. 51-6. at 35-38. Mr. Craig testified that he asked Lt. Jackson why he was not getting recreation time and was told "we'll run rec when we want to run rec[1]," and to file a grievance for his concerns. *Id*. Mr. Craig testified that Captain Ernest was the captain of the cellhouse and was named as a defendant because Mr. Craig explained that he was not getting recreation, and he didn't start giving them recreation every day. *Id*. at 38-41. When Mr. Craig discussed his recreation concerns with Captain Ernest, the captain told him that it would get better eventually and to file a grievance about his concerns. *Id*.

### III.
### Discussion

When the Court screened Mr. Craig's complaint pursuant to 28 U.S.C. § 1915A, Mr. Craig was allowed to proceed on Eighth Amendment claims against the Defendants regarding his lack of recreation.

**A. Eighth Amendment Claim**

Lack of exercise can rise to a constitutional violation "[w]here movement is denied and muscles are allowed to atrophy [ ] [and] the health of the individual is threatened." *French v. Owens,* 777 F.2d at 1250, 1255 (7th Cir. 1985); *Antonelli v. Sheahan*, 81 F.3d 1422, 1432 (7th Cir. 1996) ("Lack of exercise may rise to a constitutional violation in extreme and prolonged situations

---

[1] Lt. Jackson denies that he said this, and that he never deliberately blocked Mr. Craig from receiving recreation time, that he only did not run recreation time during a COVID-19 lockdown or when there was not enough staffing. Dkt. 51-1 at 2-3. The Court finds this dispute immaterial.

5

where movement is denied to the point that the inmate's health is threatened."); *see also Delaney v. DeTella,* 256 F.3d 679, 684 (7th Cir. 2001); *Thomas v. Ramos,* 130 F.3d 754, 764 (7th Cir. 1997). The Seventh Circuit has noted that there is a significant difference between a lack of outdoor recreation and an inability to exercise, in one's cell or in jail common areas. *Smith v. Dart*, 803 F.3d 304, 313 (7th Cir. 2015).

While the Seventh Circuit has recognized a "goal" of at least five hours of out-of-cell exercise per week, this is not a bright line rule. It has also been recognized, prior to the COVID-19 pandemic, that there are circumstances that make it reasonable to not meet this minimum, including when the deprivation is short-term or when the inmate's disciplinary record makes it reasonable to restrict him based on the prison's interest in order and safety. *See Watt v. Ramos*, 948 F. Supp. 739, 743-44 (7th Cir. 1996) (citing *Henderson v. Lane*, 979 F.2d 466, 468 (7th Cir. 1992) (one hour of recreation per week was not clearly unconstitutional for an inmate in Illinois' "circuit rider" program who was "a fractious and predatory inmate who refused to conform to the rules of the prison system" and who had been "disciplined on numerous occasions for assaultive behavior 'which had not ceased despite all efforts of the prison system'"); *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) (a "short-term" denial of outdoor recreation for twenty-eight days, when it was believed that the prisoner was in danger, did not violate the constitution).

Mr. Craig acknowledges that he was informed by Defendants and other correctional staff that outdoor recreation would not occur because of either a COVID-19 quarantine or insufficient staffing levels. Dkt. 1 at 3-4; dkt. 51-6 at 15-16. In his response and deposition, Mr. Craig argues that the Defendants created "fake quarantines" or created false shortages of staff. Dkt. 51-6 at 52-54; dkt. 56 at 4-5. Mr. Craig's only support for his claim that the quarantines and staff shortages were created under false pretenses is his own speculation, which is insufficient to create a dispute

of fact. *See White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (non movant receives the "benefit of reasonable inferences from the evidence, but not speculative inferences in his favor" (cleaned up)). There is no evidence to refute Warden Regale's testimony that the prison staff was impacted, like much of the world, by the COVID-19 pandemic, or that the prison staff took the pandemic seriously and locked down housing units when one inmate tested positive to reduce the spread of the virus. Additionally, Mr. Craig has not argued or introduced evidence that he was unable to exercise while confined in his cell, where he did not have a cell mate.

The Court has recognized that safety concerns are a sufficient basis to impose reasonable restrictions on outdoor recreation. No reasonable jury would find that COVID-19 pandemic related quarantines imposed at Pendleton or unavoidable staff shortages violate a prisoner's constitutional rights, at a time when the outside world was also experiencing quarantines and limited access to facilities and services.

### B. Qualified Immunity

Even if a jury *could* find that the limited recreation time was unreasonable, Defendants are entitled to qualified immunity. "Qualified immunity is a doctrine that protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (cleaned up). Once a defendant raises qualified immunity as a defense, the burden shifts to the plaintiff to defeat it by showing "two elements: first, that the facts show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the alleged violation." *Id.* (cleaned up). "'If *either* inquiry is answered in the negative, the defendant official' is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d

836, 844 (7th Cir. 2019) (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (emphasis in original)).

The Court finds the second element dispositive. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. . . . Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 11−12 (2015) (cleaned up). Courts cannot define "clearly established law at a high level of generality" but rather must assess "whether the violative nature of *particular* conduct is clearly established." *Id.* (cleaned up). The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments[.]" *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

Mr. Craig has not and cannot meet his burden. As explained above, he has not shown that any Defendant violated his constitutional rights. He has not presented, nor has the Court located, any decision of the Supreme Court or the Court of Appeals for the Seventh Circuit supporting a constitutional challenge to the implementation of quarantine and reduced recreation time after the COVID-19 pandemic began. Mr. Craig has only cited to cases that discuss deprivation of exercise in a time prior to the complications and concerns of a global pandemic. However, even before the pandemic, the Seventh Circuit has granted qualified immunity in various cases involving recreational restrictions imposed as a punishment for bad behavior. *See Thomas*, 918 F. Supp. 228 (30-day general lock-down plus additional 40-day restriction from outside recreation); *Morissette v. Ramos*, No. 94 C 3426, 1996 WL 521170, (N.D. Ill. Sept. 5, 1996) (63-day restriction); *Pritchett v. Godinez*, No. 94 C 5724, 1996 WL 164396 (N.D. Ill. Mar. 29, 1996) (90-day restriction).

It is clearly established that prison officials may not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease" under the Eighth Amendment. *Helling*

*v. McKinney*, 509 U.S. 25, 33 (1993). And although COVID-19 was a new virus, the duty to protect inmates from needless exposure to a serious illness "need not be litigated and then established disease by disease[.]" *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017).

Many courts have granted qualified immunity to jail and prison administrators given the evolving nature of the virus and the related recommendations for keeping incarcerated individuals safe. *See, e.g., Jones v. Burt*, Case No. 1:21-cv-41, 2022 WL 4244298, *5 (W.D. Mich. July 15, 2022) (granting qualified immunity on claim related to failure to social distance because "[n]o court has found that the inability of prison officials to ensure social distancing occurs during the COVID-19 pandemic, standing by itself, and in light of other measures . . . such as . . . setting up isolation areas for known COVID-positive prisoners, violates the Eighth Amendment."); *Ross v. Russell*, Case No. 7:20-cv-000774, 2022 WL 767093, *14 (W.D. Va., Mar. 14, 2022) (finding jail officials were entitled to qualified immunity because, given the ongoing and changing guidance from health officials as to a novel virus, "neither the policies or occasional lapses [in enforcing the policies] were clearly insufficient to protect prisoners"). Here, Defendants' conduct did not expose Mr. Craig to a greater risk of exposure to COVID-19 but rather sought to *prevent* his exposure with the unfortunate consequence that he had fewer outdoor recreation opportunities for a few months. No case law would put Defendants on notice that restricting exercise to prevent the spread of a novel communicable disease would be a violation of a prisoner's civil rights. Accordingly, the Court concludes that Defendants are entitled to qualified immunity.

Because Defendants are entitled to qualified immunity, summary judgment is **granted** as to the Eighth Amendment claim against them.

## IV.
## Conclusion

Defendants' motion for summary judgment is **GRANTED**. Dkt. [50].  Final judgment will issue in a separate entry.

**IT IS SO ORDERED.**

Date: 2/11/2026

JAMES R. SWEENEY II, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distribution:

LARRY CRAIG
956703
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Inmate Mail/Parcels
4490 West Reformatory Road
PENDLETON, IN 46064

All Electronically Registered Counsel